Mr. Justice Douglas,
with whom The Chief Justice and Mr. Justice Frahkfurter concur,
dissenting.
The first Organic Act for Alaska became a law on May 17, 1884, 23 Stat. 24. It contained a provision in § 8 which reads as follows:
“the Indians or other persons in said district shall not be disturbed in the possession of any lands actually in their use or occupation or now claimed by them but the *850 terms under which such persons may acquire title to such lands is reserved for future legislation by Congress: And 'provided further, That parties who have located mines or mineral privileges therein under the laws of the United States applicable to the public domain, or who have occupied and improved or exercised acts of ownership over such claims, shall not be disturbed therein, but shall be allowed to perfect their title to such claims by payment as aforesaid.”
Section 12 provided for a report upon “the condition of the Indians residing in said Territory, what lands, if any, should be reserved for their use, what provision shall be made for their education [sic], what rights by occupation of settlers should be recognized,” etc.
Respondent contends, and the Court apparently agrees, that this provision should be read, not as recognizing Indian title but as reserving the question whether they have any rights in the land.
It is said that since § 8 contemplates the possible future acquisition of “title,” it expressly negates any idea that the Indians have any “title.” That is the argument; and that apparently is the conclusion of the Court.
There are, it seems to me, two answers to that proposition.
First. The first turns on the words of the Act. The general land laws of the United States were not made applicable to Alaska. § 8. No provision was made for opening up the lands to settlement, for clearing titles, for issuing patents, all as explained in Gruening, The State of Alaska (1954), p. 47 et seq. There were, however, at least two classes of claimants to Alaskan lands— one, the Indians; the other, those who had mining claims. Section 8 of the Act did not recognize the “title” of either. Rather, it provided that one group, the miners, should be allowed to “perfect their title”; while the others, the Indians, were to acquire “title” only as provided by future legislation. Obviously the word “title” was used in the conveyancer’s sense; and •§ 8 did service in opening the door to perfection of “title” in the case of miners, and in deferring the perfection of “title” in the case of the Indians.
_ Second. The second proposition turns on the legislative history of § 8. Section 8 of the Act commands that the Indians “shall not be disturbed in the possession of any lands actually in their use or occupation or now claimed by them.” The words “or now claimed by them” *851 were added by an amendment offered during the debates by Senator Plumb of Kansas. 15 Cong. Rec. 627-628. Senator Benjamin.Harrison, in accepting the amendment, said, “* * * it was the intention of the committee to protect to the fullest extent all the rights of the Indians in Alaska and of any residents who had settled there but at the same time to allow the development of the mineral resources. * * *” Id.
Senator Plumb spoke somewhat humorously about the rights of the Indians:
“I do not know by what tenure the Indians are there nor what ordinarily characterizes their claim of title, but it will be observed that the language of the proviso I propose to amend puts them into very small quarters. I think about 2 feet by 6 to each Indian would be the proper construction of the language ‘actually in their use or occupation.’ Under the general rule of occupation applied to an Indian by a white man, that would be a tolerably limited occupation and might possibly land them in the sea.” Id., 530.
Senator Plumb went on to say, “I propose that the Indian shall at least have as many rights after the passage of this bill as he had before.” Id., 531. Senator Harrison replied that it was the intention of the committee “to save from all possible invasion the rights of the Indian residents of Alaska.” Id., 531. He gave emphasis to the point by this addition:
“It was the object of the committee absolutely to save the rights of all occupying Indians in that Territory until the report which is provided for in another section of the bill could be made, when the Secretary of the Interior could ascertain what their claims were and could definitely define any reservations that were necessary to be set apart for their use. We did not intend to allow any invasion of the Territory by which private right could be acquired by any person except in so far as it was necessary in order to establish title to mining claims in the Territory. Believing that that would occupy but the smallest portion of the territory here and there, isolated and detached and small quantities of ground, we thought the reservation of lands occupied by the Indians or by anybody else was a sufficient guard against any serious invasion of their rights.” Id., 531.
The conclusion seems clear that Congress in the 1884 Act recognized the claims of these Indians to their Alaskan lands. What those lands were was not known. Where they were located, what were their metes and bounds, were also unknown. Senator Plumb thought *852 they probably were small and restricted. But all agreed that the Indians were to keep them, wherever they lay. It must be remembered that the Congress was legislating about a Territory concerning which little was known. No report was available showing the nature and extent of any claims to the land. No Indian was present to point out his tribe’s domain. Therefore3 Congress did the humane thing of saving to the Indians all rights claimed; it let them keep what they had prior to the new Act. The future course of action was made clear— conflicting claims would be reconciled and the Indian lands would be put into reservations.
That purpose is wholly at war with the one now attributed to the Congress of reserving for some future day the question whether the Indians were to have any rights to the land.*
There remains the question what kind of “title” the right of use and occupancy embraces. Some Indian rights concern fishing alone. See Tulee v. Washington, 315 U. S. 681. Others may include only hunting or grazing or other limited uses. Whether the rights recognized in 1884, embraced rights to timber, litigated here, has not been determined by the finders of fact. The case should be remanded for those findings. It is sufficient now only to determine that under the jurisdictional Act the Court of Claims is empowered to entertain the complaint by reason of the recognition afforded the Indian rights by the Act of 1884.

The reading which the Court gives the 1884 Act dispels the slight hope which Ernest Gruening, our foremost Alaskan authority, found in its provisions dealing with the Indians. In The State of Alaska (1954) 355-356, Gruening states:
“Por the first seventeen years of United States rule over Alaska, the aboriginal inhabitants, who constituted an overwhelming majority of its approximately thirty thousand souls, were as devoid of attention, or even mention, as was the population as a whole. They became, by virtue of the organic act of 1884, in one respect at least, a mildly privileged, or at least a less disadvantaged, group, as compared with subsequently arriving Americans.
“Por the act provided ‘that the Indians or other persons . . . shall not be disturbed in the possession of any lands actually in their use or occupation or now claimed by them.’ The natives’ right of occupancy was, in other words, affirmed, while all later arrivals had to await the slow evolution of the land laws for even the assurance of the right to possess land.
“ ‘The terms under which such persons (the Indians or other persons),’ continued the act, ‘may acquire title to such lands is reserved for future legislation by Congress.’
“Seventy years of future had passed by 1954 and the legislation by which the titles to Indians’ lands could be acquired had not yet been enacted by Congress.”